# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| JOHN DOE, | | |
| | Plaintiff, | Civil No.  18-919 (JRT/KMM) |
| v. | | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| THE BLAKE SCHOOL, | | |
| | Defendant. | |

> Robert Bennett and Marc Betinsky, **GASKINS, BENNETT & BIRRELL, LLP**, 333 South Seventh Street, Suite 3000, Minneapolis, MN  55402, and Beau McGraw, **MCGRAW LAW FIRM, PA**, 10390 39th Street North, Lake Elmo, MN  55042, for plaintiff.
>
> Charles Knapp and Kathlyn Noecker, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN  55402, for defendant.

Plaintiff John Doe, a high school senior, was placed on indefinite suspension by Defendant The Blake School ("Blake") for his behavior at a February 10, 2018, school dance.  Doe admits that he came to the dance drunk, danced aggressively, and ran twice from police, but he denies allegations that he groped one freshman girl and sexually harassed a second.  Doe alleges that Blake's investigation into these allegations and its disciplinary process were negligent and violated Title IX, Title VI, and the Minnesota Human Rights Act ("MHRA"), and moves for a preliminary injunction.  Because Doe has not yet shown a fair chance of prevailing on his claims or that he will be irreparably harmed absent an injunction, the Court will deny Doe's motion.

# BACKGROUND

## I.    THE PARTIES

John Doe[1] is a mixed-race student attending The Blake School.  (Compl. ¶ 2, Apr. 2, 2018, Docket No. 1.)  He has worked as a camp counselor at Blake since he was 11, and has been involved in coaching youth sports.  (Declaration of John Doe ("Doe Decl.") ¶ 4, Apr. 11, 2018, Docket No. 14.)  Doe, a senior, has attended Blake since kindergarten, and has received significant financial aid during the course of his enrollment.  (Decl. of Joseph Ruggiero ("Ruggiero Decl.") ¶¶ 6-7, Apr. 20, 2018, Docket No. 27.)  Doe believes that he will not be able to afford to attend college without a scholarship.  (Doe Decl. ¶ 8.)  In part through his involvement in sports at Blake, Doe earned a full Division I athletic scholarship.  (*Id.* ¶ 6.)

The Blake School is a private prekindergarten through 12th grade school in Hopkins with roughly 1,375 students.  (Compl. ¶¶ 3, 7.)  Because Blake receives some federal funding, it is subject to Title VI and Title IX.  (*See id.* ¶¶ 8, 15, 108.)  Blake stresses its commitment to pluralism, noting that 30% of its students identify as students of color and 22% of its students receive financial aid.  (Ruggiero Decl. ¶ 5.)  According to Doe, however, only 1.7% of Blake's upper school students are African-American males.  (Decl. of Robert Bennett ("Bennett Decl.") ¶ 3, Apr. 23, 2018, Docket No. 33.)

---

[1] United States Magistrate Judge Katherine Menendez granted plaintiff's unopposed motion to proceed under the pseudonym John Doe because the litigation is of a sensitive and personal nature.  (*See* Order, Apr. 11, 2018, Docket No. 10.)

## II.    THE DANCE

On Saturday, February 10, 2018, Doe and 20 to 25 other students drank at a classmate's house and rode a bus to a school dance at Blake.[2]  (Compl. ¶¶ 42-44.)  The dance was staffed by two Blake administrators, a Hopkins police officer, and adult volunteers.  (Decl. of Mike Canfield ("Canfield Decl.") ¶¶ 4, 7, Apr. 20, 2018, Docket No. 22.)  Students entered through a single point of access, where adults checked to see if they had brought prohibited items or appeared intoxicated.  (*Id.* ¶ 5.)  Students were required to arrive between 8:30 and 9:00 p.m.  (*Id.* ¶ 6.)  Doe and the other students arrived at 8:45 p.m., took off their shoes, and danced.  (Compl. ¶¶ 45-46.)

According to Doe, he "danced by jumping up and down, grinding, and twerking for approximately an hour with no objection from Blake staff."  (*Id.* ¶ 47.)  Doe says that, at one point, a girl pressed up behind him and he danced with her for a few moments before she walked away; then, as he went to get a drink of water, her friend told him that the way he had danced was inappropriate.  (*Id.* ¶¶ 49-51.)  Doe ignored her and went to a photo booth with his friends.  (*Id.* ¶ 52.)

According to Blake, several freshmen girls approached freshman class dean Jeanette Vance to report that Doe had grabbed one of them ("Student A") inappropriately and that they believed that he had been drinking.  (Decl. of Jeanette Vance ("Vance

---

[2] A Blake official states that neither he nor "other Blake staff members observed or received reports of other students at the dance suspected of being under the influence."  (Decl. of Shawn Reid ¶ 9, Apr. 20, 2018, Docket No. 25.)

Decl.") ¶ 4, Apr. 20, 2018, Docket No. 28.)  Specifically, Student A, who is African-American, alleged to Vance that Doe approached her, told her that he liked that she knew the words to the song that was playing, grabbed her by the hips and pulled her close, moved his hands down her hips, and then "moved his hands all the way down her crotch and grabbed her vagina area."  (*Id.* ¶¶ 6-8.)  The student and her friends moved to the other side of the dance floor; it is alleged that Doe followed them and again grabbed Student A by the crotch.  (*Id.* ¶ 8.)  It was further alleged that the student's two friends told Doe to stop and pushed him away from Student A, he put his arms around one of them ("Student B"), began grinding against her from behind, and held her even as she tried to push him away.  (*Id.* ¶¶ 9, 15-16.)  Eventually Doe moved away; the girls then left the dance floor and reported him to Vance.  (*Id.*)

These divergent narratives reunify when Doe was confronted by sophomore class dean Mike Canfield, who took him into a classroom to meet Vance and Officer Leland Coleman.  (Compl. ¶ 53; Canfield Decl. ¶¶ 4, 9-10.)  Canfield told Doe that one or more students had complained about unwelcome touching,[3] that faculty suspected he was drinking, and that he would have to take a breathalyzer test.  (Compl. ¶¶ 54-55; Canfield Decl. ¶¶ 11, 14; Vance Decl. ¶ 13.)  According to Blake, Doe denied that he would put

---

[3] Doe says that Canfield told him that there was a complaint about him "grabbing a girl's hips."  (Compl. ¶ 54.)  Vance says that she told Doe "that girls had reported that he had inappropriately touched them on the dance floor."  (Vance Decl. ¶ 13.)  Canfield says that he told Doe that multiple girls "said he had been grabbing girls inappropriately on the dance floor," and that he believes that Doe "understood this was a serious situation involving really inappropriate touching that was way out of line."  (Canfield Decl. ¶ 11.)

his scholarship at risk by drinking and stated his view that he was being singled out because he was black.  (Canfield Decl. ¶¶ 12-13; Vance Decl. ¶¶ 11-13.)  Doe ran from the classroom without his shoes or coat, and, with Canfield and Coleman after him, was quickly apprehended.  (Compl. ¶¶ 56-57; Canfield Decl. ¶¶ 15-16; Vance Decl. ¶ 13.) Doe voluntarily got into a police car and was taken back to the school.  (Compl. ¶ 58; Canfield Decl. ¶ 16.)  When Coleman opened the door to give him a breath test, Doe again ran.  (Compl. ¶¶ 59-60; Canfield Decl. ¶ 17.)  He surrendered when an officer pointed a weapon at him and ordered him to stop.  (Compl. ¶ 60; Canfield Decl. ¶ 17.) Doe was eventually released to his mother's custody.  (Compl. ¶ 61.)

Doe's mother spoke with senior class dean Shawn Reid twice that evening. According to Doe, Reid told her that Doe was believed to have groped a girl at the dance but that she should not worry about it, because Doe "wasn't doing anything different than anyone else."  (*Id.* ¶¶ 62-66.)  According to Reid, he told Doe's mother that he was suspected of drinking, "that he was accused of grabbing the crotch of one or more girls," and that he had run from police.  (Decl. of Shawn Reid ("Reid Decl.") ¶ 8, Apr. 20, 2018, Docket No. 25.)  According to Doe, an officer told Doe's mother that law enforcement was only interested in Doe's drinking and flight from police and was not investigating the groping allegation.  (Compl. ¶ 68.)

## III.    THE ADJUDICATION

Blake's handbook sets out a policy for investigating and adjudicating harassment, including allegations of sexual misconduct.  (Compl. ¶ 26, Ex. 1 at 43-45, Apr. 2, 2018,

Docket No. 1-1.)  Specifically, it defines sexual harassment to include "[u]nwelcome touching in any form" and "[p]hysical assault," and warns that sexual harassment "may result in warnings, suspensions or immediate dismissal of a student." (*Id.* at 44.)  The handbook describes Blake's commitment to a full review of complaints, a "thorough and fair" investigation, and "compassionate and confidential" proceedings.[4]  (*Id.*) Harassment is considered a "major infraction," consequences for which "usually include suspension or expulsion." (*Id.* at 42.)

The handbook also outlines Blake's disciplinary procedures for major infractions. (*Id.* at 42-43.)  It states that students will be informed of the alleged infractions and asked to present an explanation in a meeting with their grade dean. (*Id.* at 42.)  The grade dean will consult with the upper school director to determine how discipline will be handled; from there, the process is at the discretion of the administration. (*Id.*)  Final authority for discipline rests with the upper school director unless expulsion is being considered, in which case it rests with the head of school. (*Id.* at 43.)  A Community Judiciary Board ("CJB") may be tasked with making recommendations. (*Id.* at 42.)  The CJB includes

---

[4] The Department of Education Office for Civil Rights promulgated regulations on sexual harassment in 2001. (Compl. ¶ 17.)  These regulations state that procedures must "accord[] due process to both parties involved" in a complaint, including notice of procedure, application of the noticed procedure, "adequate, reliable, and impartial investigation," and prompt timeframes. (*Id.* ¶¶ 20-21.)  A 2017 guidance document states that, for an investigation to be "equitable," the school should use a trained investigator, avoid techniques that apply sex stereotypes or generalizations, and provide the responding party with sufficient details of the allegations, time to prepare a response, notice and time to prepare for any hearing, and a written report of the evidence used to reach the conclusion. (*Id.* ¶ 25.)

eight students elected from grades 10 to 12, two faculty members, and upper school assistant director Paul Menge. (Decl. of Paul Menge ("Menge Decl.") ¶ 3, Apr. 20, 2018, Docket No. 23.) This year, three of the eight students are students of color; two identify as African-American. (*Id.* ¶ 4.)

On Monday, February 12, Reid – Doe's grade dean – told Doe that he would be going before the CJB because he was accused of drinking alcohol and dancing inappropriately. (Compl. ¶ 73.) Doe alleges that his mother asked Reid about the latter accusation, and Reid told her that the main thing Doe should be concerned about was drinking and running from police. (*Id.* ¶ 74.) Reid told Doe to prepare a statement about his actions and advised him on its content. (*Id.* ¶¶ 71, 75.) According to Reid, in at least one of his conversations with Doe and his mother, Reid made clear that Doe was accused of grabbing girls in the crotch. (Reid Decl. ¶ 12.) Reid says that Doe consistently denied that he grabbed any girls that way. (*Id.* ¶ 14.)

Also on Monday, a junior student ("Student D") approached a teacher and, with some reluctance, reported that Doe had grabbed her by the hips and moved his hands toward her crotch, followed her and a friend across the gym, and repeated his actions. (Decl. of Anne Rubin ¶¶ 3-5, Apr. 20, 2018, Docket No. 26.) Student D said that she was not aware of the other complaints. (*Id.* ¶ 7.) This complaint did not go to the CJB.[5]

---

[5] After this action was filed, a fourth student ("Student E") also brought similar allegations against Doe. (Ruggiero Decl. ¶ 15.)

On Tuesday, February 13, Doe says that he was told for the first time that he was facing accusations of sexual assault from two freshman girls. (Compl. ¶¶ 80-82.) Doe was shown the girls' statements. (*Id.* ¶¶ 82-83.) Doe was taken before the CJB "within minutes" of being shown the statements. (*Id.* ¶ 84.) The CJB first heard from upper school director Joseph Ruggiero, who said that the CJB's recommendation would be advisory. (Menge Decl. ¶¶ 6-7.) Next it heard from Reid, who described his observations at the dance and his discussions with Doe afterward, and from Vance, who presented "information from her investigation."[6] (*Id.* ¶ 8.) Finally, it heard from Doe, who read his prepared statement. (*Id.* ¶ 9.) Doe's statement focused on drinking and running from police; however, Doe acknowledged that he had been "jostling people more than necessary," that he was told both by a student and by Blake staff that he was dancing inappropriately, and that he "may have needed to be removed from the dance floor."[7] (Compl. ¶¶ 76-77; Menge Decl. ¶ 9, Ex. 1, Apr. 20, 2018, Docket No. 23-1.)

---

[6] Vance states that she "had no reason to question the credibility of the information provided by Student A or Student B, and, based on the entirety of the investigation, [she] believe[s] the information they gave [her] was accurate." (Vance Decl. ¶ 19.) There is nothing in the record to indicate that Vance did anything to investigate other than speak to the two students Saturday night and on Monday. That said, Vance interviewed Student A and Student B separately, and they corroborated each another. (*See id.* ¶¶ 6, 14-15, 17.)

[7] According to Blake, after Doe finished reading his statement CJB members asked him questions. (Menge Decl. ¶ 9.) According to Doe, the Board had only one question for him. (Compl. ¶ 85.) Doe says that Reid told him that he had "never seen a situation" where the CJB did not have questions for the accused and said that it was "ridiculous" for him to have to "explain how he was dancing when everyone was doing the same thing." (*Id.* ¶ 87.)

The CJB met to deliberate on both February 13 and February 14.  (Menge Decl. ¶ 10.)  CJB members agreed that "Doe's conduct at the dance constituted sexual harassment and/or sexual assault under School policies" and that Doe should be punished both for those actions and for his choice to drink.  (*Id.* ¶ 11.)  The CJB was evenly divided as to its recommended punishment, with half of its members believing Doe should be expelled and half believing he should be required to finish his coursework off campus.[8]  (*Id.* ¶ 13.)  "After receiving the CJB recommendations, Blake administrators met and deliberated at length regarding the appropriate consequences for Doe's actions." (Reid Decl. ¶ 15.)  In an email to the Blake Community, Head of School Anne Stavney stated that she made the ultimate decision based on a consensus of administrators.  (Decl. of Robert Bennett ¶ 4, Ex. 1 ("Stavney Email") at 3, Apr. 23, 2018, Docket No. 33-1.)

## IV.    THE DISCIPLINE

On Friday, February 16, Ruggiero and Reid called Doe and his mother to school and informed them that Doe was to be suspended indefinitely, barred from campus, and prohibited from playing sports.  (Compl. ¶¶ 88-89; Reid Decl. ¶ 15; Ruggiero Decl. ¶ 14.) However, Doe alleges that the administrators told his mother that "the school would not put anything in [Doe's permanent file about the sexual allegations . . . as long as he left the school quietly."  (Compl. ¶ 90.)  Blake has not squarely denied the allegation;

---

[8] Presumably Menge is a nonvoting member and it was the eight students and two faculty members who were evenly divided.  (*See* Menge Decl. ¶ 3).

although Stavney's email stated broadly that "[t]he student who perpetrated the assault was never told that the disciplinary action would be left out of his record," Doe's allegation is focused on reference to sexual misconduct.  (Stavney Email at 3.)

On Sunday, February 18, Doe received a letter from Reid describing Doe's infractions (including "[s]exual harassment of  fellow students") and his punishment. (Compl. ¶ 91, Ex. 2 at 1, Apr. 2, 2018, Docket No. 1-2.)  The letter noted that Doe would continue his coursework remotely so that he could earn his diploma on schedule and that Blake would provide a math tutor and college counseling as necessary.  (*Id.*)  Doe's mother also received a copy of Doe's permanent file, which stated that the reason for the discipline was "sexual" in nature.  (Compl. ¶ 93.)

Believing that this result would cost him his athletic scholarship, (Doe Decl. ¶¶ 6-8), Doe retained counsel and threatened legal action in the course of asking the school to reconsider, (*see* Compl. ¶ 94, Ex. 3, Apr. 2, 2018, Docket No. 1-3.)  Blake did reconsider, but concluded that its prior investigation was sufficient and its second look only reaffirmed its conclusions.  (Compl. ¶ 95, Ex. 4 at 1, Apr. 2, 2018, Docket No. 1-4.) Stavney wrote to Doe's mother that Doe had admitted that he had been told his dancing was inappropriate, that he had denied to the CJB that he had grabbed girls' crotches, and that Blake's published disciplinary process was followed.  (*Id.* at 3-4.)  Nonetheless, Stavney offered for Blake to assist Doe in gaining access to other athletic opportunities, including a post-graduate year in a high-level lacrosse program.  (*Id.* at 6.)  Through counsel, Blake also offered to "consider [Doe's] input" regarding Blake's communication with the college that admitted him and to "consult and advise [Doe] regarding the content

of [his own] communication to put things in the most positive light with an objective of retaining his admission and scholarship." (*Id.* at 1-2.) Doe's offer of admission and scholarship have since been irreversibly revoked. (Bennett Decl. ¶ 2.)

Doe has obtained statements from four witnesses who he says "would have supported [his] contention that he did not commit the acts he is alleged to have committed" if he was given more time to assemble evidence for the hearing. (Compl. ¶¶ 98-102.) Two of the witnesses allege that the school treated allegations against white male students much differently. (*Id.* ¶¶ 98-99.) Blake denies this in part, stating that "not all of the information . . . about other alleged student misconduct and discipline is accurate." (Def.'s Opp. Mem. at 22, Apr. 20, 2018, Docket No. 21 (quoting Compl. ¶ 95, Ex. 4 at 1).)

## V.    THIS ACTION

Doe filed this action on April 2, bringing claims for (1) negligence in the student disciplinary process with respect to the standards set forth in Blake's handbook and Title IX; (2) a Title VI violation; (3) an MHRA violation; (4) declaratory judgment that Blake's student disciplinary process violates Title IX; (5) erroneous outcome under Title IX; and (6) deliberate indifference under Title IX. (Compl. ¶¶ 103-138). Doe ultimately seeks a declaration that Blake's actions violated its contractual obligations and Title IX and were willful and reckless and an order requiring Blake to expunge the process from its records, prohibiting Blake from referencing the process, and allowing Doe to tell third parties that he has not been accused of sexual misconduct. (*Id.* at 31.) He also seeks an injunction directing Blake to comply with Title IX and its own handbook, compensatory

damages, and attorney fees. (*Id.* at 31-32.) On April 11, Doe filed the Motion for Preliminary Injunction that is now before the Court. (Mot. for Prelim. Inj., Apr. 11, 2018, Docket No. 11.)

## DISCUSSION

## I.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court considers four factors in determining whether to issue a preliminary injunction: (1) the likelihood that the moving party will succeed on the merits, (2) the threat of irreparable harm to the moving party, (3) the balance of harms as between the parties, and (4) the public interest. *See Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. "The burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II.    LIKELIHOOD OF SUCCESS

"In balancing the equities no single factor is determinative." *Dataphase*, 640 F.2d at 113. However, likelihood of success on the merits is the most significant factor in considering a preliminary injunction. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch.*

*Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). The moving party must prove a "fair chance of prevailing," which means "something less than fifty percent." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730, 732-33 (8th Cir. 2008) (en banc).

Doe's allegations fall into three buckets: (1) that Blake violated its common law duty to not arbitrarily dismiss students because its haphazard disciplinary process violated the procedures in Blake's handbook and in law; (2) Blake discriminated against Doe on the basis of race because it treated him differently than similarly-situated white students; and (3) Blake discriminated against Doe on the basis of sex because its procedures violate Title IX and it presumed his guilt because he is male.

### A.    Negligence

In Minnesota, a negligence claim has four elements: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) the plaintiff was injured; and (4) the defendant's breach of the duty of care was the proximate cause of the injury. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581-82 (Minn. 2012). Doe alleges that Blake owed him a duty of care to properly conduct its student disciplinary process according to its handbook, Title IX regulations, and industry standards; that Blake's investigation and discipline breached that duty; and that the resulting suspension cost him his athletic scholarship. (*See* Compl. ¶¶ 104-105.)

### 1.    Duty

Minnesota "common law imposes a duty on the part of private universities not to expel students in an arbitrary manner." *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d

464, 470 (Minn. Ct. App. 2001) (citing *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112 (Minn. 1977)). "[I]f a student's expulsion results from the arbitrary, capricious, or bad-faith actions of university officials, the judiciary will intervene and direct the university to treat the student fairly." *Abbariao*, 258 N.W.2d at 112.

This case does not involve expulsion, but Doe argues that the same logic should apply to his indefinite suspension. In Minnesota, a defendant owes "a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). Doe submits that Blake's creation of a disciplinary process created a foreseeable risk of harm to the student if the institution conducts the process in a negligent manner, citing *Doe v. Brandeis University*, 177 F. Supp. 3d 561, 614 (D. Mass. 2016) (applying Massachusetts law) and *Doe v. University of the South*, No. 9-62, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011) (applying Tennessee law).[9]

The Court recently considered the same argument in another case, denying a motion to dismiss because a more developed factual record was required to determine whether such a duty of care exists. *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 995 (D. Minn. 2017). But *St. Thomas* was "a close case" at the motion to dismiss stage; the

---

[9] Doe argues that the scope of Blake's duty of care may be determined by considering Blake's student handbook and the requirements of Title VI and IX. *See ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 307 (Minn. 1996) (looking "to a contractual relationship, to an applicable statute, the common law, or the conduct of parties"). Doe acknowledges that the handbook was not a contract. *See Rollins*, 626 N.W.2d at 470.

Court was "skeptical" that the plaintiff would ultimately prevail. *Id.* And another court in this district dismissed a similar claim after considering the same argument. *Doe v. St. John's Univ.*, No. 17-2413, 2017 WL 4863066, at *5 (D. Minn. Oct. 26, 2017). As such, while Doe's claim would likely survive a motion to dismiss, it is not clear that he has shown a "fair chance of prevailing" on the merits for purposes of immediate injunctive relief. Because it is unclear, however, the Court will proceed to consider Doe's allegations of breach.

### 2. Breach

Doe alleges that Blake breached its duty to him by (1) failing to provide sufficient notice of the allegations and thereby failing to give him sufficient time to prepare for the hearing; (2) providing an advisor that misled him and his mother into believing the sexual misconduct allegations were not worth worrying about; and (3) using minor school children as factfinders. (Compl. ¶ 105.)

The record shows that Blake gave Doe sufficient notice of the nature of allegations against him, even if it was not clear about their severity. Doe's complaint states that Canfield told Doe that a girl had complained about how he had touched her when he was removed from the dance; that Reid told his mother that Doe had groped someone when he called her on the night of the dance; that Doe was shown statements from the girls prior to the CJB hearing; and that Doe's prepared statement contained a version of events consistent with what he continues to maintain actually happened. As such, Doe cannot plausibly claim that he did not have notice of the allegations against him.

However, Doe's claim that Reid and others downplayed the seriousness of the sexual misconduct allegations against him has merit. Blake says that it "does not understand why anyone would believe that such serious sexual assault allegations 'were not worth worrying about.'" (Def.'s Opp. Mem. at 22, Apr. 20, 2018, Docket No. 21.) One reason might be that a school administrator told the accused's mother "not to worry about" the allegations, because the accused "wasn't doing anything different than anyone else." (Compl. ¶ 66.) Another could be that the same administrator later told the mother that "the main thing [the accused] should be concerned about was the drinking and running from police." (*Id.* ¶ 74.) In contrast to Blake's straightforward denial of Doe's claim that he lacked notice, the record is curiously bereft of an explicit denial that Reid made the statements Doe imputes to him.[10] Reid spoke extensively with Doe and his mother as Doe prepared his statement; as such, it is plausible that Reid's advice shaped Doe's statement, and, in turn, the CJB's recommendations and Blake's discipline.[11] However, Doe falls short of showing a "fair chance of prevailing" on this claim – particularly given that it is not clear that Blake had a duty to Doe in the first place. As

_____

[10] (*Compare* Reid Decl. ¶ 12 ("I made clear the allegations against him, including that he was accused of grabbing girls in the crotch."), *with id.* ("I had no doubt that Doe understood the allegations against him and the seriousness of the issues he was facing.").)

[11] A third reason for this mistaken belief could be that police told the mother that law enforcement "did not have concern with the alleged groping and was not investigating it any further." (*Id.* ¶ 68.) A fourth possible reason is that none of the school administrators who interacted with the accused on the night in question report interviewing him about the sexual misconduct allegations against him, in stark contrast to their focus on giving him a breath test.

such, even if this claim is plausible, it cannot justify granting Doe the "extraordinary remedy" of a preliminary injunction.

Finally, Doe's claim that Blake was negligent in using minor children as factfinders is without merit. The handbook makes clear that major infractions, including harassment, may be referred to the CJB for a recommendation. The handbook makes equally clear that this recommendation is only advisory. It does not appear that the CJB conducts factfinding; rather, it provides student input on disciplinary decisions. Nor does it appear that the process as applied to Doe differed in any material way from the process outlined in the handbook, particularly in light of the fact that the handbook explicitly states that the process will proceed at the discretion of school administrators. As such, Doe has not shown a fair chance of prevailing on the claim that it was negligent for Blake to seek a recommendation from the CJB.

## B.    Race Discrimination

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Individuals may bring claims for injunctive relief or damages under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). Title VI prohibits only intentional discrimination; proof of disparate impact is insufficient. *Id.* at 280. If a plaintiff lacks direct evidence of the defendant's discriminatory animus, courts employ a burden-shifting framework: if a

plaintiff makes out a prima facie case, the defendant must give a nondiscriminatory reason for its action; if the defendant does so, the plaintiff must prove that it is mere pretext. *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) (applying framework in a Title VII case), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998) (affirming use of the framework in the Title VI context).  Likewise, the MHRA provides, in relevant part:  "It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, [or] national origin . . . ."  Minn. Stat. § 363A.13, subd. 1.  The parties agree that "[t]he MHRA is typically construed in accordance with federal precedent concerning analogous federal statutes."  *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 793 (8th Cir. 2010).

Doe alleges that Blake violated Title VI and the MHRA by subjecting him to discrimination on the basis of race because it removed him from Blake on the basis of allegations that did not result in the removal of similarly situated non-African-American students.  (Compl. ¶¶ 109, 116-17.)  A conclusory allegation of discrimination without supporting "facts showing that similarly situated [individuals] were treated differently" cannot support a claim, *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (Title VII), but Doe alleges that he has obtained statements from two anonymous student witnesses with facts supporting this claim.  The first states that, when she reported being sexually assaulted by a white male Blake student, Blake took no action against the perpetrator and discouraged her from pursuing the matter.  (*Id.* ¶ 98).  The

second states that, when she accompanied a friend who reported being sexually assaulted by a white male Blake student, Blake told the friend that it would be hard on her socially if the school opened an investigation and she should go to police instead because the assault took place off-campus.  (*Id.* ¶ 99.)

Blake denies these factual allegations in part, stating that "not all of the information . . . about other alleged student misconduct and discipline is accurate." (Def.'s Opp. Mem. at 22 (quoting Compl. ¶ 95, Ex. 4 at 1).)  Stressing its commitment to pluralism and inclusion, Blake steadfastly denies that race played any part in Doe's discipline, calling "the notion that Blake would somehow become motivated to discriminate against" Doe "ill-conceived and nonsensical."  (*Id.* at 5-6.)  Blake argues that its discipline of Doe was entirely justified entirely by the seriousness of his actions.

Although Doe's allegations certainly give him a good chance of showing a prima facie case of discrimination, the record now before the Court is not developed enough to say that he stands a fair chance of showing that Blake's proffered reasons for discipline are pretextual, a higher standard.[12]  *See Rodgers*, 417 F.3d at 850-54.  This is not to say

---

[12] That said, the Court is singularly unpersuaded by Blake's protestation that it cannot have acted with racial animus against Doe because it has given him substantial financial support, because it could have treated him more harshly, and because Student A, the police officer, and two members of the CJB are African-American.  The fact that Blake gave Doe financial support so that he could attend is not relevant to whether it discriminated against him once he was there – let alone once he was accused of sexual misconduct.  The fact that Blake could have treated Doe more harshly is not relevant to the question whether it treated similarly-situated white students less harshly.  And the fact that the police officer and two members of the CJB are African-American is not relevant to anything at all.

that Doe will be unable to do so at a later date. Indeed, these allegations may present a strong claim against Blake. But, the Court acknowledges that it is difficult for Doe to adequately substantiate this claim without the benefit of discovery. It is only to say that, at this stage, Doe has not alleged facts sufficient to show a fair chance of demonstrating there are no "mitigating or distinguishing circumstances" distinguishing his disciplinary case from those of his comparators such that they are "similarly situated in all relevant aspects." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

### C.    Sex Discrimination

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Doe alleges that Blake violated Title IX in three ways: (1) its disciplinary process is not in compliance with Department of Education regulations; (2) the erroneous outcome discriminated against Doe on the basis of sex; and (3) Blake's deliberate indifference to its error discriminates against Doe on the basis of sex. (Compl. ¶¶ 123, 129-132, 136-137.)

### 1.   Declaratory Judgment

First, Doe seeks declaratory judgment that Blake's disciplinary process as written and as applied to Doe violates Title IX. (Compl. ¶ 124.) Under *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), there is no private right of action to enforce grievance procedures and other regulations under Title IX because a school's

failure to follow such procedures and regulations does not constitute Title IX "discrimination." *St. Thomas*, 240 F. Supp. 3d at 989 (collecting cases); *see also St. John's*, 2017 WL 4863066 at *3. The Declaratory Judgments Act is not an independent source of federal jurisdiction. *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950). As such, Doe's claim for declaratory judgment will fail.

### 2.    Gender Bias

"As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." *St. Thomas*, 240 F. Supp. 3d at 989; *see also Stenzel v. Peterson*, No. 17-580, 2017 WL 4081897, at *3 (D. Minn. Sept. 13, 2017). "To allege a Title IX claim based on a disciplinary proceeding under either [an] erroneous outcome or deliberate indifference theory, [a plaintiff] must plausibly allege circumstances suggesting gender bias motivated [the] disciplinary proceeding." *St. Thomas*, 240 F. Supp. 3d at 990.

Here, Doe advances two conclusory allegations: first, that "[t]he erroneous outcome of the hearing can only be explained by gender bias against males in cases involving allegations of sexual assault," (Compl. ¶ 132), and second, that the "failure and refusal" of Blake's agents to correct the error "can only be explained by gender bias against males," (*Id.* ¶ 137). Doe argues that Blake discriminated against him by crediting

the statements of his female accusers and disregarding his denial,[13] (Pl.'s Reply at 17, Apr. 23, 2018, Docket No. 32), and that now-rescinded Title IX guidance from the Department of Education pressured schools to "treat male students accused of sexual misconduct with a presumption of guilt . . . under the guise of making campuses safe for female students," (Compl. ¶¶ 9-10).

"[M]ere allegations that a disciplinary process was unfair or failed to take into account certain information do not create an inference of gender bias sufficient for Title IX." *Stenzel*, 2017 WL 4081897, at *5. Nor do allegations "that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators." *Id.* (quoting *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)). Finally, "a general reference to federal pressure, by itself, is insufficient to show gender bias." *St. Thomas*, 240 F. Supp. 3d at 992 (noting that, as here, plaintiff "did not allege any targeted stress [the school] faced from government institutions or the public at large"); *see also St. John's*, 2017 WL 4863066 at *4. As such, Doe has not shown any chance, let alone a fair chance, of prevailing on these claims.

---

[13] Doe makes much of the fact that no adults can corroborate the allegations against him, arguing that "at least one of these adults engaged in close monitoring and supervision should have seen something" had he done anything wrong. (Pl.'s Reply at 3.) But it is easy to imagine how the adults could have missed seeing what allegedly happened, especially given that consent is a key question. At the hearing on this motion, counsel for Doe said that students who enter a "mosh pit" generally consent to what happens therein and suggested that the freshman girls may have simply misunderstood Doe's conduct. But it should go without saying that consent may be withdrawn. Students A and B alleged that Doe followed them when they moved across the dance floor to get away from him, grabbed Student A by the crotch a second time, and – after being directly told to stop – grabbed Student B and held on to her as she tried to pull away.

## III.    IRREPARABLE HARM

Although likelihood of success on the merits is the most significant factor in considering a preliminary injunction, *S.J.W. ex rel. Wilson*, 696 F.3d at 776, a plaintiff's failure to show irreparable harm is sufficient to deny an injunction, *Dataphase*, 640 F.2d at 114 n.9. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson*, 696 F.3d at 776 (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). Doe alleges four types of irreparable harm: (1) loss of the second semester of his senior year, (2) reputational harm, (3) loss of his athletic scholarship, and (4) potential loss of the opportunity to attend college elsewhere.

As a preliminary matter, the Court must consider whether delay "belies any claim of irreparable injury pending trial." *Hubbard Feeds v. Animal Feed Supplement*, 182 F.3d 598, 603 (8th Cir. 1999). Doe filed this action six weeks after his discipline was handed down and moved for a preliminary injunction soon thereafter. The reason for this short delay was that Doe first sought a negotiated solution. "The Court will not fault a party for attempting to resolve a dispute more amicably." *Millennium Imp. Co. v. Sidney Frank Importing Co.*, No. 03-5141, 2004 WL 1447915, at *11 (D. Minn. June 11, 2004).

First, it is certain that Doe will miss out on memorable opportunities – including the lacrosse season, prom, and graduation – without an injunction. It is equally certain that such experiences cannot be valued. It is less certain, however, that this loss warrants the extraordinary remedy of a preliminary injunction. Doe submits cases where courts discuss similar emotional losses in the course of finding irreparable harm, but the key to each finding is harm to the plaintiffs' education. Indeed, in all but one of Doe's cited cases the plaintiff would have been delayed from timely completing his or her course of study.[14] In the last, the court held that requiring a student to be home-schooled during a year-long suspension may cause irreparable harm – but that case relied on an earlier case holding that home schooling "does not represent an educational experience sufficiently similar to in-school instruction to eliminate the possibility of irreparable harm." *Snyder ex rel Snyder v. Farnsworth*, 896 F. Supp. 96, 98 (N.D.N.Y. 1995) (citing *Ross v. Disare*, 500 F. Supp. 928, 934 & n.7 (S.D.N.Y. 1977)). Here, by contrast, Blake is allowing Doe to complete his coursework remotely to earn his diploma on time. And, although Doe describes this alternative as "reek[ing] of separate but equal," (Pl.'s Reply at 5), and this

---

[14] *See Doe v. Univ. of Cincinnati*, No. 1:15-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) (plaintiff "will be unable to graduate as planned this year"); *Doe v. Middlebury Coll.*, No. 1:15-192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (plaintiff would be unable to graduate on time as required for job); *Coulter v. E. Stroudsburg Univ.*, No. A.3:10-0877, 2010 WL 1816632, at *3 (M.D. Pa. May 5, 2010) (plaintiff would be barred from taking final exams, delaying graduation); *Axelrod v. Phillips Acad., Andover*, 36 F. Supp. 2d 46, 50 (D. Mass. 1999) (plaintiff "would not graduate with his class" due to expulsion); *Jones v. Bd. of Governors of Univ. of N. Carolina*, 557 F. Supp. 263, 266 (W.D.N.C. 1983) (plaintiff's semester suspension would delay completion of her degree).

alleged harm admittedly presents a very close case, the Court finds that it is sufficiently similar to in-school instruction to mitigate the risk of irreparable harm.

Second, it is likely that Doe's reputation has been harmed, at least to the extent that his identity is known within the Blake community. "[T]he threat of reputational harm may form the basis for preliminary injunctive relief." *Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013). In *Kroupa*, the Eighth Circuit found irreparable harm based in part upon harm to plaintiff's reputation when a 4-H club's "defamatory state action served to confirm and validate what would otherwise have been peer rumor and suspicion." *Id.* at 821. Stavney's email referring to the "student who perpetrated the assault," (Stavney Email at 2), may have confirmed and validated the accusations, but she sent that email in response to media attention surrounding this case, it was sent only to the Blake community, and it did not identify Doe by name. Moreover, in *Kroupa*, the plaintiff alleged that the widespread harm to her public reputation would destroy her chances of career in agriculture. 731 F.3d at 821. At this juncture, by contrast, the harm to Doe's reputation is limited to the Blake community. And, because Doe posits that success in this case is what can restore his reputation, the existence of irreparable harm relies on Doe's ability to show a fair chance of prevailing on the merits.

Third, Doe's allegations related to the loss of his athletic scholarship do not present the kind of irreparable harm that an injunction is designed to prevent. First, Doe's statement that he will be unable to afford to attend college without a scholarship shows that most of this harm is compensable through a damages award. Second, because Doe has already irrevocably lost the scholarship, this harm has already taken place. *See*

*CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8ᵗʰ Cir. 2009) (affirming denial of preliminary injunction when harm had already occurred).

Finally, because this disciplinary action must be disclosed on the Common Application for college admission, Doe argues that he may be unable to gain admission to any college or university. But Doe submits no support for this allegation. And counsel for Blake stated at the hearing on this motion that Blake's director for college counseling is certain that Doe will still be able to gain admission and financial aid. In general, speculative harm or the mere possibility of harm is insufficient. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Doe does submit two cases where courts discussed the impact of plaintiff's ability to enroll in comparable institutions in the course of finding irreparable harm. But in each, the key was again that the plaintiff faced delayed completion of his degree. *Doe v. Penn. State Univ.*, 276 F. Supp. 3d 300, 314 (M.D. Pa. 2017) (discussing plaintiff's inability to mitigate that harm through admission into other institutions); *Marshall v. Ohio Univ.*, No. 2:15-775, 2015 WL 1179955, at *9 (S.D. Ohio Mar. 13, 2015) (same). Although the harm alleged here presents an extremely close case, without more evidence it is too speculative for the Court to find that it is irreparable.

Doe's most certain harm is the financial loss of his scholarship and the emotional harm caused by the loss of a senior semester's worth of memories. Both are compensable through money damages. As such, the Court finds that Doe has not shown the existence of irreparable harm requiring a clear and present need for equitable relief.

## IV.  BALANCE OF HARMS AND THE PUBLIC INTEREST

The remaining two factors do not clearly favor either party.  Blake submits that it has an interest in disciplining its students and in preserving a campus free of sexual harassment and sexual assault.  That interest is undoubtedly important.  But Blake goes further, suggesting that issuing an injunction would send a message to victims that they should not come forward.  Not so.  The accused are not without rights.  Even though Doe maintains that he is innocent, the motion the Court now adjudicates does not turn on what Doe did or did not do.  It turns instead on whether Blake was negligent or discriminatory in how it handled the allegations against him.  An injunction would not be an exoneration of Doe; it would be an indictment of Blake.  Likewise, Doe overreaches by depicting this action as "a dispute between Plaintiff and Blake which will have little impact on anyone other than Plaintiff and Blake."  (Pl.'s Supp. Mem. at 22, Apr. 11, 2018, Docket No. 15.)  This ignores the fact that four students have brought serious allegations of sexual misconduct against Doe.  According to Doe, a Blake dean told him that those allegations were less serious than his drinking and flight from police, and Blake previously declined to investigate similar allegations brought by others against white students.  These allegations against Blake implicate not only Doe's rights, but those of the four students who brought complaints against Doe, those who brought complaints in the past, and the public interest.

## V.    CONCLUSION

The Court will deny Doe's motion for a preliminary injunction, but the message should be clear:  victims of sexual misconduct, those who stand accused, and society as a whole all benefit from ensuring that allegations of sexual misconduct are handled in a non-negligent and non-discriminatory manner.   Two of Doe's claims, that similar allegations against non-African-American students were handled differently and that he was improperly discouraged from responding to the claims of sexual misconduct, merit a more thorough review after the facts are developed in discovery.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**  that Plaintiff's Motion  for a  Preliminary  Injunction  [Docket No. 11]  is **DENIED**.

DATED:  May 7, 2018                              _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                    Chief Judge
                                                      United States District Court